## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| AMERICAN BRASS ROD FAIR TRADE COALITION, *et al.*, | |
| Plaintiffs, | |
| v. | |
| UNITED STATES, | Before:  Joseph A. Laroski, Jr., Judge |
| Defendant, | Court No. 24-00119 |
| and | |
| RAJHANS METALS PRIVATE LIMITED, | |
| Defendant-Intervenor. | |

### PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiffs American Brass Rod Fair Trade Coalition and its members, Mueller Brass Co. and Wieland Chase LLC, respectfully submit this Motion for Judgment on the Agency Record with regard to the three Counts set forth in their Complaint filed August 9, 2024 (dkt. 10).  This action challenges the final determination issued by the U.S. Department of Commerce in the antidumping duty investigation of Brass Rod from India.  *See Brass Rod From India: Final Affirmative Determination of Sales at Less Than Fair Value*, 89 Fed. Reg. 29,300 (Dep't Commerce Apr. 22, 2024).  This Motion is timely filed pursuant to the Court's Revised Scheduling Order issued on December 6, 2024 (dkt. 27).

For the reasons set forth in the accompanying Brief in Support of this Motion, Plaintiffs hereby move and respectfully request that the Court grant this Motion.

A proposed order is attached.

Respectfully submitted,


/s/ Paul K. Keith

Paul K. Keith, Esq.
Daniel J. Calhoun, Esq.
Jack A. Levy, Esq.
Noah A. Meyer, Esq.
Neal M. Halper, *Director of Accounting*
Susan Moyer, *Director Data Analysis*
Carl P. Moyer, *Director Economic Analysis*
Hiroko K. Hagen, *Director Statistical Analysis*
Stan T. Bowen, CPA

**ROCK CREEK TRADE LLP**
900 19th Street, NW
Suite 600
Washington, DC 20006
(202) 230-6630
*Counsel for Plaintiffs American Brass Rod Fair*
*Trade Coalition and its members Mueller Brass Co.*
*and Wieland Chase LLC*


Dated:  January 10, 2025

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| AMERICAN BRASS ROD FAIR TRADE COALITION, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> RAJHANS METALS PRIVATE LIMITED, <br><br> Defendant-Intervenor. | Before:  Joseph A. Laroski, Jr., Judge <br> Court No. 24-00119 |

### <u>ORDER</u>

Upon consideration of Plaintiffs' Motion for Judgment on the Agency Record and accompanying Brief in Support, responses thereto, and all other pertinent papers and proceedings herein, it is hereby

**ORDERED** that Plaintiffs' Motion for Judgment on the Agency Record is **GRANTED**, and it is further

**ORDERED** that the determination of the U.S. Department of Commerce ("Commerce") in *Brass Rod From India: Final Affirmative Determination of Sales at Less Than Fair Value*, 89 Fed. Reg. 29,300 (Dep't Commerce Apr. 22, 2024) ("*Final Determination*") to grant Rajhans Metals Private Limited ("Rajhans") a work-in-progress inventory adjustment to its cost of manufacturing is **REMANDED** for further consideration consistent with this opinion; and it is further

      **ORDERED** that Commerce's adjustment to Rajhans' scrap recovery methodology in the *Final Determination* is **REMANDED** for further consideration consistent with this opinion; and it is further

      **ORDERED** that Commerce's calculation of the All Others rate in the *Final Determination* is **REMANDED** for further consideration consistent with this opinion; and it is further

      **ORDERED** that Commerce shall file its remand redetermination with the Court within 90 days of the issuance of this Order; and it is further

      **ORDERED** that the parties shall have 30 days thereafter to file comments on Commerce's remand redetermination; and it is further

      **ORDERED** that the parties shall have 15 days thereafter to file replies to comments on Commerce's remand redetermination.

      **SO ORDERED.**

                                     _____

                                     Joseph A. Laroski, Jr.
                                     Judge

Dated:_____
        New York, New York

## UNITED STATES COURT OF INTERNATIONAL TRADE

AMERICAN BRASS ROD FAIR TRADE COALITION, *et al.*,

          Plaintiffs,

v.

UNITED STATES,

          Defendant,

and

RAJHANS METALS PRIVATE LIMITED,

          Defendant-Intervenor.

Before:  Joseph A. Laroski, Jr., Judge
Court No. 24-00119

**NON-CONFIDENTIAL VERSION**

Rajhans' Business Proprietary Information Removed from Brackets on Pages 8, 10-11, 18-24, 26, 29-32

## BRIEF OF PLAINTIFFS IN SUPPORT OF THEIR
## RULE 56.2 MOTION FOR JUDGEMENT ON THE AGENCY RECORD

Paul K. Keith, Esq.
Daniel J. Calhoun, Esq.
Jack A. Levy, Esq.
Noah A. Meyer, Esq.
Neal M. Halper*, Director of Accounting*
Susan Moyer, *Director Data Analysis*
Carl P. Moyer, *Director Economic Analysis*
Hiroko K. Hagen, *Director Statistical Analysis*
Stan T. Bowen, CPA

**ROCK CREEK TRADE LLP**
900 19th Street, NW
Suite 600
Washington, DC 20006
(202) 230-6630
*Counsel for Plaintiffs American Brass Rod Fair Trade Coalition and its members Mueller Brass Co. and Wieland Chase LLC*

Dated:  January 10, 2025

## TABLE OF CONTENTS

Page

I.     ADMINISTRATIVE DETERMINATION UNDER REVIEW ........................................ 1

II.    ISSUES PRESENTED ........................................................................................... 1

III.   STATEMENT OF FACTS ...................................................................................... 1

IV.    SUMMARY OF ARGUMENT .................................................................................. 9

V.     ARGUMENT ....................................................................................................... 12

       A.     Standard of Review ................................................................................. 12

       B.     Commerce's Decision to Grant a WIP Inventory Adjustment to Rajhans
              Was Unsupported by Substantial Evidence and Not in Accordance with
              Law ....................................................................................................... 14

              1.     Rajhans' Cost Reporting Methodology Already Accounts for
                     Purported Changes in WIP ........................................................... 15

              2.     WIP Inventory Adjustments Do Not Apply to Finished Goods and
                     Saleable Merchandise ................................................................. 19

              3.     Rajhans' WIP Inventory Adjustment Is Distortive ......................... 22

              4.     In Granting the WIP Inventory Adjustment, Commerce Should
                     Have Made Further Adjustments to Rajhans' Scrap Offset ............ 23

       C.     Commerce's Adjustment to Rajhans' Scrap Recovery Methodology Is
              Unsupported By Substantial Evidence and Not in Accordance With Law ......... 25

              1.     Commerce Failed to Address the Scrap Value Variation Issue in
                     the Final Determination ............................................................... 28

              2.     Commerce Failed to Correct the Distortion Caused By Rajhans'
                     Flawed Methodology ................................................................... 30

       D.     Should the Court Invalidate Rajhans' Final Dumping Margin, the Court
              Must Also Invalidate the Resulting Calculation of the All Others Rate ............... 32

VI.    CONCLUSION ................................................................................................... 33

NON-CONFIDENTIAL VERSION

## TABLE OF AUTHORITIES

Page(s)

**Statutes**

19 U.S.C. § 1673d(c)(5)(A)……………………………………………………..9, 32

19 U.S.C. § 1516a(b)(1)(B)…………………………………………………………...12

**Court Decisions**

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951)……………………………………12

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)……...13

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024)………………………….....……...13

*Fla. Power & Light Co. v. Lorion*, 470 U.S. 729 (1985)……………………………..………14

*Tianjin Magnesium Int'l Co. v. United States,* 722 F. Supp. 2d 1322 (2010)………………12, 25

*Matsushita Elec. Indus. Co. Ltd. v. United States*, 750 F.2d 927 (Fed. Cir. 1984)……………...13

*Delverde, SrL v. United States*, 202 F.3d 1360 (Fed. Cir. 2000)…………………………..……13

*NMB Sing. Ltd v. United States*, 557 F.3d 1316 (Fed. Cir. 2009)……………………………13-14

*SKF USA Inc. v. United States*, 630 F.3d 1365 (Fed. Cir. 2011)………………………………...29

*Torrington Co. v. United States*, 926 F. Supp. 1151 (Ct. Int'l Trade 1996)……………..14, 20, 22

*Allied Tube and Conduit Corp. v. United States*, 25 CIT 23 (2001)…………………………14-15

*Guizhou Tyre Co., Ltd. v. United States*, 389 F. Supp. 3d 1350 (Ct. Int'l Trade 2019)……...29-30

**Administrative Determinations**

*Brass Rod From India: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 88 Fed. Reg. 83,900 (Dec. 1, 2023)……………………………………………………………2

*Brass Rod From India: Final Affirmative Determination of Sales at Less Than Fair Value*, 89 Fed. Reg. 29,300 (April 22, 2024)………………………………………..……1, 5-6

*Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From Mexico: Final Results of Antidumping Duty Administrative Review; 2018-2019*, 86 Fed. Reg. 41,448 (Dep't Commerce Aug. 2, 2021)………..……………………………….………14

Page(s)

*Certain Cold-Rolled Steel Flat Products from the Republic of Korea: Final Results of Antidumping Administrative Review*; 84 Fed. Reg. 10,784 (Dep't Commerce Mar. 22, 2019)…17

*Common Alloy Aluminum Sheet from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2020-2021*, 87 Fed. Reg. 54,975 (Dep't Commerce Sept. 8, 2022)……………………………………………………………..23-24

*Certain Oil Country Tubular Good from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 Fed. Reg. 41949 (Dep't Commerce July 13, 2020)…………………………………………………………...24

**NON-CONFIDENTIAL VERSION**

## STATEMENTS PURSUANT TO RULE 56.2

### I.     ADMINISTRATIVE DETERMINATION UNDER REVIEW

The administrative determination under review is Commerce's final determination in *Brass Rod From India: Final Affirmative Determination of Sales at Less Than Fair Value*, 89 Fed. Reg. 29,300 (Dep't Commerce Apr. 22, 2024) ("*Final Determination*") (PR 303), and accompanying Issues and Decision Memorandum ("Final IDM") (PR 293).

### II.     ISSUES PRESENTED

A.  Whether Commerce's work-in-progress inventory adjustment to Rajhans' reported manufacturing costs is supported by substantial evidence and otherwise in accordance with law.

B.  Whether Commerce's adjustment to Rajhans' runaround scrap cost offset is supported by substantial evidence and otherwise in accordance with law.

C.  Whether, in the event the Court invalidates the dumping margin calculated for Rajhans in the *Final Determination*, the "All Others" rate calculated in the *Final Determination* is supported by substantial evidence and otherwise in accordance with law.

### III.     STATEMENT OF FACTS

On April 27, 2023, Plaintiffs filed petitions with Commerce alleging, *inter alia*, that imports of brass rod from India were being sold in the United States at less than fair value.  *See Brass Rod From Brazil, India, Israel, Mexico, the Republic of Korea, and South Africa: Initiation of Less-Than-Fair-Value Investigations*, 88 Fed. Reg. 33,575 (Dep't Commerce May 24, 2023) (PR 41).  Commerce initiated an investigation of the subject imports on May 17, 2023. *See id.*  Commerce ultimately selected Rajhans Metals Pvt Ltd ("Rajhans") and Shree Extrusions

**NON-CONFIDENTIAL VERSION**

Limited ("Shree") as the two mandatory respondents. *See Brass Rod From India: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 88 Fed. Reg. 83,900 (Dep't Commerce Dec. 1, 2023) (PR 236) ("*Preliminary Determination*"), and accompanying preliminary decision memorandum (PR 217) ("PDM") at 2.

Commerce issued its initial antidumping duty questionnaire to Rajhans on June 21, 2023. *See* Commerce Letter to Rajhans, "Request for Information" (June 21, 2023) (PR 63). Rajhans submitted questionnaire responses concerning its production activities in India, production costs, and U.S. sales. *See* Rajhans Letter, "Section A Response" (July 26, 2023) (PR 108-09, CR 41-43); Rajhans Letter, "Sections B-D Response" (Aug. 24, 2023) (PR 141-42, CR 74-140). On September 14, 2023, Commerce issued a supplemental questionnaire to Rajhans concerning its section D response, identifying cost-related areas that required additional information and clarification. *See* Commerce Letter to Rajhans, "Section D Supplemental Questionnaire" (Sept. 14, 2023) (PR 154, CR 142).

On September 18, 2023, Plaintiffs identified various deficiencies in Rajhans' sections A-C responses, s*ee* Coalition Letter, "Petitioners' Deficiency Comments on Sections A-C Questionnaire Responses of Rajhans Metals Private Limited" (Sept. 18, 2023) (PR 162, CR 156), and Commerce issued another supplemental questionnaire to Rajhans on September 19, 2023. *See* Commerce Letter, "Request for Information for Rajhans Metals Private Limited" (Sept. 19, 2023) (PR 166, CR 158).

Rajhans submitted its response to the section D supplemental questionnaire on October 11, 2023. *See* Rajhans Letter, "First Supplemental D Response" (Oct. 11, 2023) (PR 185, CR 165-201) ("First D SQR"). The response included a multitude of new exhibits and revised

NON-CONFIDENTIAL VERSION

versions of many of the exhibits included with Rajhans' initial section D response.  *See id.* at 29

(providing the list of exhibits).  Rajhans submitted its response to the sections A-C supplemental

questionnaire on October 20, 2023, which likewise included many new and revised exhibits.  *See*

Rajhans Letter, "First Supplemental A-C Response" (Oct. 20, 2023) (PR 196-97, CR 202-232).

On October 30, 2023, Plaintiffs submitted comments in advance of the preliminary

determination arguing, *inter alia*, that Rajhans' CONNUM-specific scrap recovery methodology

was unreasonable and distortive and that Commerce should deny Rajhans a work-in-process

("WIP") adjustment.  *See* Coalition Letter, "Petitioners' Pre-Preliminary Comments on Rajhans

Metals Private Limited" (Oct. 30, 2023) (PR 202, CR 244).  On November 14, 2023, Rajhans

submitted comments in advance of the preliminary determination responding to Plaintiffs' pre-

preliminary comments.  *See* Rajhans Letter, "Rajhans' Comments in Advance of Commerce's

Preliminary Determination" (Nov. 14, 2023) (PR 207, CR 245).

Commerce published the *Preliminary Determination* on December 1, 2023.  In the

*Preliminary Determination*, Commerce revised Rajhans' reported scrap offset for bar and rod

products ("brass rod") and removed any "double-counting" of Rajhans' claimed adjustment for a

change in WIP inventory.  *See* Commerce Memorandum, "Cost of Production and Constructed

Value Calculation Adjustments for the Preliminary Determination – Rajhans Metals Private

Limited" (Nov. 24, 2023) (CR 250, PR 221) ("Prelim Cost Memo") at 2-3.  Regarding the scrap

offset, Commerce explained that Rajhans "calculated the scrap offset for the brass rod production

stage based on standard yield rates," but that the data did not support its assertion that its

"processing yield losses for bar and rod products are not dependent on the grade of brass rod

products but rather, they are dependent on the shape and size of the brass bar and rod products

that are produced."  *Id.* at 2.  Therefore, because Rajhans' scrap quantities were derived from

**NON-CONFIDENTIAL VERSION**

these unsupported yield percentages, Commerce did not use Rajhans' reported scrap offset and instead calculated a single POI average per-unit scrap offset amount to apply to all its CONNUMs. *Id.*

On November 27, 2023, after Commerce had already issued its preliminary decision memorandum, Commerce issued a second supplemental questionnaire to Rajhans concerning its Section D reporting. *See* Commerce Letter, "Section D 2nd Supplemental Questionnaire" (Nov. 27, 2023) (PR 219, CR 248). Days later, on November 30, 2023, Commerce issued its cost verification agenda for Rajhans, scheduling Rajhans' cost verification — where issues such as Rajhans' scrap offset and WIP adjustment would be examined — from December 18, 2023, through December 22, 2023. *See* Commerce Letter, "Cost Verification Agenda" (Nov. 30, 2023) (PR 232, CR 261). Rajhans submitted its second section D supplemental questionnaire response on December 12, 2023, less than a week before the start of its cost verification. *See* Rajhans Letter, "Second Supplemental Section D Response" (Dec. 13, 2023) (PR 244, CR 268-79) ("Second D SQR"). As Plaintiffs detailed in pre-verification comments filed on December 15, 2023, Rajhans' Second D SQR included "new explanations regarding the nature of its 'chemical codes,' which have been central to {Rajhans'} reporting methodology," as well as a changed explanation regarding yield loss, which Rajhans offered to "correct previous misstatements." Coalition Letter, "Petitioners' Pre-Verification Comments Concerning Rajhans Metals Private Limited's Cost" (Dec. 15, 2023) (PR 247, CR 280) at 2.

Rajhans' Second D SQR again revised key exhibits, providing "re-revised" versions of Exhibit D-9(a) (reporting Rajhans' raw material cost and consumption), Exhibit D-9(b) (reporting raw material costs for production of specific billet types), Exhibit D-10(a) (reporting the CONNUM-specific material costs for bar and rod products), Exhibit D-14 (providing a

NON-CONFIDENTIAL VERSION

reconciliation of reported cost of manufacturing), and Exhibit D-18 (providing Rajhans' cost of production database). *See* Second D SQR at Exhibits D-9(a), D-9(b), D-10(a), D-14, D-18 (CR 274-278). Thus, Rajhans' factual record and the exhibits that formed the basis of its entire cost reporting methodology continued to evolve until just a few days before verification.

Commerce issued its cost verification report for Rajhans on February 12, 2024. *See* Commerce Memorandum, "Verification of the Cost Response of Rajhans Metals Private Limited" (Feb. 12, 2024) (PR 265, CR 345) ("Cost Verification Report"). In it, Commerce stated that Rajhans' "standard yield rates used for the reported cost were consistent with the actual production yields," and therefore "it may appropriate to reverse the scrap adjustment Commerce made in the preliminary determination related to yield losses" for the final determination. *Id.* at 16. Commerce also stated that Rajhans "removed the work-in-process (WIP) inventory reconciling item from its cost reconciliation" and therefore "the WIP inventory adjustment made in the preliminary determination {to remove double-counting of the WIP adjustment} is no longer necessary." *Id.* at 11.

Plaintiffs and Rajhans filed administrative case and rebuttal briefs with Commerce on March 11, 2024, and March 25, 2024, respectively. *See* Coalition Letter, "Petitioners' Case Brief" (Mar. 12, 2024) (PR 274, CR 349) ("Petitioners' Case Brief"); Rajhans Letter, "Rajhans' Initial Brief" (Mar. 11, 2024) (PR 272, CR 347); Coalition Letter, "Petitioners' Rebuttal Brief" (Mar. 26, 2024) (PR 284, CR 353);[1] Rajhans Letter, "Administrative Rebuttal Brief" (Mar. 25, 2024) (PR 283, CR 350). Commerce published its *Final Determination* on April 22, 2024. *See*

---

[1] Plaintiffs re-filed their rebuttal brief on March 29, 2024, after redacting a portion of their argument at Commerce's request. *See* Coalition Letter, "Revised Rebuttal Brief" (Mar. 29, 2024) (PR 289, CR 355).

NON-CONFIDENTIAL VERSION

*Final Determination*, 89 Fed. Reg. 29,300 (April 22, 2024) (PR 303).  Additional facts specific to the WIP inventory adjustment and scrap offset issues are provided below.

### A.  Rajhans' WIP Inventory Adjustment

In reporting its costs at the outset of the investigation, Rajhans claimed a WIP inventory adjustment to its cost of manufacturing ("COM") to account for partially finished goods that were still undergoing production during the period of investigation ("POI").  *See* First D SQR at 18 and Revised Exhibit D-10(a), Part 2 (CR 165, 194, PR 185).  Plaintiffs objected to any WIP inventory adjustment in comments submitted in advance of the preliminary determination.  *See See* Coalition Letter, "Petitioners' Pre-Preliminary Comments on Rajhans Metals Private Limited" (Oct. 30, 2023) at 19 (PR 202, CR 244).  In the *Preliminary Determination*, Commerce granted Rajhans its requested WIP inventory adjustment, although it did adjust Rajhans' reported COM to avoid any "double counting" of the claimed WIP inventory adjustment.  *See* Commerce Preliminary Cost Calculation Memorandum (Nov. 24, 2023) at 2-3 and Attachment 3 (CR 250, PR 221).

In their case brief, Plaintiffs raised continued objections to any WIP inventory adjustment to Rajhans' reported costs.  Plaintiffs emphasized that Rajhans reported its costs based on a two-step, process-oriented costing methodology in which Rajhans accumulated its POI production costs first at the "billet production stage," and then at the "rod production stage," before allocating those costs based on the finished production.  Plaintiffs explained that Rajhans' employed methodology eliminated any need to account for WIP adjustments for semi-finished goods still in inventory.  *See* Petitioners' Case Brief at 17-18.  Plaintiffs additionally argued that the items for which Rajhans claimed a WIP inventory adjustment — which included in-scope

NON-CONFIDENTIAL VERSION

brass billets — were saleable merchandise not eligible for a WIP inventory adjustment under Commerce's established practice.  *See id.* at 18-20.

Plaintiffs therefore urged Commerce to remove any WIP inventory adjustment for Rajhans in the final determination to avoid distortions to the calculated dumping margin.  *See id.* at 20, n.17.  Moreover, even if Commerce continued to erroneously grant a WIP inventory adjustment in the *Final Determination*, Plaintiffs identified the need to further adjust Rajhans' scrap offset to ensure that the scrap offset amount matches the value of runaround scrap when reintroduced into the billet production process.  *See id.* at 21-22.

Notwithstanding these arguments, in the *Final Determination*, Commerce continued to include the change in WIP inventory in calculating Rajhans' cost of manufacturing.  *See* Final IDM at 10-11.  Commerce also did not make any adjustments to Rajhans' scrap offset to account for the impact of the WIP inventory adjustment.  *See id.* at 11.

### B.  Rajhans' Runaround Scrap Valuation

Plaintiffs' case brief provided an overview of the role of scrap in Rajhans' production process.  As Plaintiffs explained, Rajhans generates brass scrap or "swarf" (which Rajhans defines as "bar and rod scrap") in the production of bar and rod, which is then "re-used by melting it along with other purchased scrap in the production {of} billets/ingots."  Petitioners' Case Brief at 6 (quoting Second D SQR at 6; Rajhans Letter, "Sections B-D Response" (Aug. 24, 2023) at D-4 (PR 141-42, CR 74-78)).

Plaintiffs also explained Rajhans' reporting methodology.  Specifically, Plaintiffs explained that Rajhans calculated its material costs at two stages — first, calculating billet cost, and then using the pristine billet cost as the material input for calculating the finished brass rod cost.  *Id.* at 7 (citing Second D SQR at Exhibits D-9(b) and D-10(a)).  As noted above, Rajhans

calculated and reported the costs of these two stages primarily in its Section D Exhibits D-9 and

D-10, *see* Second D SQR at Exhibits D-9(b) and D-10(a), which Rajhans continued to revise

after the *Preliminary Determination* and in the days leading up to the start of Commerce's cost

verification.

In Second D SQR Exhibit D-10(a) — where Rajhans calculated its scrap offset value for

each bar and rod product — Rajhans valued the scrap generated from each product based on the

chemical code-specific cost of the input billet for that product.  *See id.* at Exhibit D-10(a).  As a

result, bar and rod products made from different billets generated scrap with different per-unit

values assigned to the scrap.

Plaintiffs' case brief argued that this methodology was unreasonable and distortive.

Specifically, Plaintiffs detailed record evidence demonstrating that "[

]," Petitioners' Case Brief at 13

(citing Cost Verification Report at 5; Cost Verification Exhibits at CVE-03 p.27 (CR 281-91)),

and further emphasized that "***Rajhans itself values its self-generated scrap*** [

] ***in its own reporting***."  *Id.* at 14 (emphasis in original).  Based on

these facts, Plaintiffs argued that "Rajhans' own submissions demonstrate that self-generated

scrap can best be valued at [

] predicated on the fiction that there is a 'closed loop' between the billet grade and the

grade of the runaround scrap used to produce another billet of the identical chemical code."  *Id.*

at 14 (emphasis in original).

In the *Final Determination*, Commerce applied an adjustment to Rajhans' reported scrap

offset to address Rajhans' overvaluation of scrap as a byproduct offset, but Commerce's

adjustment did not address the separate problem of the differentiated scrap values based on

chemical code.  *See* Final IDM at 7 (PR 293) ("{F}or the final determination, we revised the value of Rajhans' scrap offset at the rod production stage based on the ratio of the POI weighted average per-unit value of reintroduced scrap at the billet production stage and the POI weighted average per-unit value of the scrap offset at the rod production stage.").  Commerce did not address, or even discuss, the differentiated scrap value problem that Plaintiffs raised in their case brief.

### C.  Calculation of the All Others Rate

Commerce calculated the "All Others" rate to be assigned to companies not individually examined in the investigation.  In accordance with 19 U.S.C. § 1673d(c)(5)(A), Commerce weight-averaged the final dumping margins calculated for Rajhans and Shree using each company's publicly ranged U.S. sales values for the merchandise under consideration, resulting in a rate of 2.41 percent.  *See Final Determination*, 89 Fed. Reg. at 29,301 (PR 303); *see also* Commerce Final All Other Rate Calculation Memorandum (Apr. 16, 2024) at 1-2 (CR 356).

## IV.    SUMMARY OF ARGUMENT

### **WIP Inventory Adjustment for Rajhans**

Commerce granted Rajhans a downward cost adjustment for WIP inventory when none was warranted.  Because Rajhans' cost reporting methodology already accounted for the effects of the change in WIP inventory, Rajhans' inclusion of an additional separate direct WIP adjustment accounted for the change in WIP twice.  To be sure, WIP inventory adjustments are sometimes appropriate to ensure that the cost of unused WIP inventory is not included in the cost buildup for the finished good.  For example, when measuring the cost of sliced bread, where you first consume flour to make dough, and then dough to make bread, it makes sense to capture the cost of the flour consumed in producing the dough being baked, but not the cost of the flour that

went into unused dough remaining in inventory.  However, if the cost of sliced bread is being reported based on a standard "recipe" that starts with the amount of flour being used and the per-unit cost of the flour, then there is no need to adjust the reported cost of the bread by the cost of flour that went towards unused dough in inventory.  That is the essence of Commerce's mistake in this case.

Rajhans produces brass rod using a two-stage production process — first, it produces billet; and second, it extrudes the billet to make a finished brass rod product.  In building up its total costs, Rajhans first calculates a per unit cost to produce billets based on standard recipes. Second, in the extrusion step to make bar and rod products, Rajhans uses standard yield rates to determine the quantity of billet consumed and thus calculates a per unit cost for bar and rod products based on the quantity and per unit cost of billet used in the extrusion step.  Given this cost reporting methodology, Commerce was wrong to make a downward adjustment to Rajhans' reported costs to account for unused WIP inventory (*i.e.*, the excess of the quantity of billets produced less the quantity of billets consumed and the quantity of billets sold).

Moreover, Commerce's practice is to not apply a WIP inventory adjustment to finished goods and saleable merchandise, and the record evidence demonstrates that the relevant WIP was saleable merchandise.  Commerce found that Rajhans' unused billets are WIP, but it ignored the fact that these billets are also in-scope merchandise that Rajhans sometimes sold during the POI.

And even assuming *arguendo* that Rajhans' reported WIP inventory adjustment was appropriate (and it is not), the manner in which Commerce applied its WIP inventory adjustment was distortive because certain brass rod products with identical input billet costs [

]. Common sense dictates that products with [          ] yield loss should have [

] because of [

], but Commerce's methodology generated the

opposite result.

Finally, by granting Rajhans its WIP inventory adjustment, Commerce effectively

allowed a reduction of the net amount of the runaround scrap in the buildup of the pristine billet

production cost.  As a result, the scrap offset for the runaround scrap failed to equal the net value

of that scrap when reintroduced into the production of billet.  Commerce failed to address this

argument except to make the conclusory statement that "no further adjustment is warranted for

the final determination."

### Valuation of Rajhans' Runaround Scrap

Commerce failed to correct, or even address, the distortive impact of Rajhans' chemical

code-specific valuation of the scrap generated from its bar and rod production.  In Plaintiffs'

administrative case brief, we separately identified two problems with Rajhans' methodology for

valuing scrap in its cost reporting and provided distinct solutions that Commerce could use to

address each problem.  Although Commerce addressed and made an adjustment to correct the

first problem, Commerce completely ignored the second problem.

Specifically, Plaintiffs argued that the scrap generated from Rajhans' bar and rod

production, for which Rajhans claimed a byproduct offset, could best be valued at [

].  Plaintiffs asserted that using one average rate to value the scrap offset would be

consistent with the reality of Rajhans' scrap recovery and use, citing evidence that Rajhans'

scrap was [

].  Plaintiffs further argued that,

because Rajhans valued scrap used as an input in its buildup of billet costs [

], using [

] to value the scrap

generated from rod production — which would ultimately be the *same* scrap used as a billet input — was distortive and unreasonable.

Because Commerce failed to address, or even discuss, this issue in the *Final Determination*, and because the scrap adjustment that Commerce did apply failed to correct the problem, the *Final Determination* is unsupported by substantial evidence and not in accordance with law.

### All Others Rate

To the extent the Court finds that the final weighted-average dumping margin calculated for Rajhans in the *Final Determination* to be unlawful for any reason, it must also find the All Others rate applicable to non-individually investigated companies, which derives in part from Rajhans' dumping margin, to be unlawful.

## V.    ARGUMENT

### A.  Standard of Review

In reviewing Commerce's *Final Determination*, this Court will "hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B).

To determine whether Commerce's decisions were supported by substantial evidence, the Court examines whether the record contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Corp. v. NLRB*, 305 U.S. 197, 229 (1938)).  Substantial evidence is "more than a scintilla" and "must take into account whatever in the record fairly detracts from its weight."  *Id*. at 477, 488.  The substantial evidence standard also requires Commerce to "articulate a satisfactory explanation for its action including a rational connection

NON-CONFIDENTIAL VERSION

between the facts found and the choice made." *Tianjin Magnesium Int'l Co. v. United States*, 722 F. Supp. 2d 1322, 1328 (2010) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, (1983)).  In sum, substantial evidence review requires the Court to determine whether the evidence is reasonable, and whether evidence-based inferences support Commerce's findings.  *See Matsushita Elec. Indus. Co. Ltd. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).

To determine whether Commerce's interpretation of a statue is "in accordance with law," courts had previously applied the two-step framework laid out in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984).  The Supreme Court recently overruled *Chevron* in *Loper Bright*, holding that courts must exercise their independent judgement in resolving statutory ambiguity.  *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 393-94 (2024).  The Supreme Court made clear that resolving the meaning of statutory language — thereby determining whether agency action is in accordance with law — is emphatically the role of the courts.  *See id.* at 401-02.  In performing this interpretive function, courts employ the traditional tools of statutory interpretation, examining the "statute's text, structure, and legislative history, and apply{ing} the relevant canons of interpretation." *Delverde, SrL v. United States*, 202 F.3d 1360, 1363 (Fed. Cir. 2000).  Even in instances "when an ambiguity happens to implicate a technical matter," the court remains the final arbiter of statutory meaning as "it does not follow that Congress has taken the power to authoritatively interpret the statute from the court and given it to the agency." *Loper Bright*, 603 U.S. at 402 (quoting *Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 98 n.8 (1983)).

Finally, Commerce's *Final Determination* "must include 'an explanation of the basis for its determination that addresses relevant arguments{} made by interested parties who are parties

to the investigation or review.'" *NMB Sing. Ltd v. United States*, 557 F.3d 1316, 1320 (Fed. Cir. 2009) (quoting 19 U.S.C. § 1677f(i)(3)(A)). In situations where "the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation and explanation." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

### B. Commerce's Decision to Grant a WIP Inventory Adjustment to Rajhans Was Unsupported by Substantial Evidence and Not in Accordance with Law

Commerce's decision to grant Rajhans a WIP inventory adjustment to its COM was unlawful, as it was unsupported by the record evidence and at odds with agency practice. To be sure, Commerce has an established practice of "routinely allow{ing} a respondent to adjust its reported COM either upward or downward to reflect period inventory adjustments as long as such adjustments result from revaluations of either raw materials or WIP and are not related to finished goods inventory." *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From Mexico: Final Results of Antidumping Duty Administrative Review; 2018-2019*, 86 Fed. Reg. 41,448 (Dep't Commerce Aug. 2, 2021) ("*Heavy Walled Rectangular Welded Carbon Pipes and Tubes from Mexico*"), and accompanying IDM at cmt. 8. Furthermore, the Court has accepted as valid Commerce's position that "raw materials and work in process are, by definition, not yet saleable merchandise." *Torrington Co. v. United States*, 926 F. Supp. 1151, 1159-1160 (Ct. Int'l Trade 1996) ("*Torrington Co.*") (quoting *Results of Antidumping Duty Administrative Reviews and Revocation in Part of an Antidumping Duty Order*, 58 Fed. Reg. 39,729, 39,745 (Dep't Commerce July 26, 1993) ("*Results of Antidumping Duty Administrative Reviews*"). Finally, it is well established that a respondent bears the burden of establishing its entitlement to any such WIP inventory adjustment. *See*, *e.g.*, *Allied Tube and Conduit Corp. v.*

*United States*, 25 CIT 23, 29 (2001) ("Commerce has reasonably placed the burden to establish

entitlement to adjustments on {respondent}, the party seeking the adjustment and the party with

access to the necessary information.") (quoting *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034,

1040 (Fed. Cir. 1996)).

### 1. *Rajhans' Cost Reporting Methodology Already Accounts for Purported Changes in WIP*

Commerce's decision to make a WIP inventory adjustment to Rajhans' COM is

impermissible for several reasons.  First, as a factual matter, the adjustment ignores the fact that

Rajhans reported its costs using a two-step costing methodology reflecting its production

process.  *See* Rajhans Cost Verification Report (Feb. 12, 2024) at 5 and 14 (PR 265, CR 345).  In

the first step, Rajhans accumulated its POI production costs at the "billet production stage" by

calculating "the chemical code-specific POI weighted average per-unit billet costs (*i.e.*, raw

materials and conversion costs) for all billets produced during the POI."  *Id.* at 14; *see also*

Second D SQR at Exhibits D-9 and D-10 (CR 274-76).  In the second step, the resulting "per-

unit billet production cost was then used in the calculation of the raw material cost for the

selected product."  Rajhans Cost Verification Report (Feb. 12, 2024) at 14 (PR 265, CR 345).

Rajhans then allocated those costs based on the finished production at each of the two stages.

*See id.*  As a result of that methodology, the weighted average billet per-unit cost became the

direct material cost at the "rod production stage."  Such direct linkage therefore eliminated the

need to account for semi-finished goods WIP adjustments because Rajhans' cost reporting

methodology already captured only the cost of goods manufactured of the final product during

the POI, which reflects the fact that the methodology is based on the per-unit billet production

cost (determined from standard recipes) multiplied by the billet consumption quantity

(determined from actual rod production and standard yields).  *See* Cost Verification Report at 4-5

(PR 265, CR 345).  Put differently, Rajhans' cost of goods manufactured is equivalent to its total manufacturing costs, thereby eliminating the need to account for any changes between beginning and ending WIP inventory.

Commerce's justification for making a WIP inventory adjustment — notwithstanding the fact that Rajhans' costing methodology already fully accounts for the cost of goods manufactured — is inherently unreasonable.  Commerce first relies on a recitation of its WIP inventory adjustment practice, which by itself fails to meaningfully address Plaintiffs' arguments.  *See* Final IDM at 10.  However, in restating its practice, Commerce acknowledges that "{t}he COM is ***normally*** calculated by adding the beginning WIP inventory and the total manufacturing costs incurred for the accounting period and deducting the value of ending WIP inventory."  *Id.* at 10 (emphasis added).  Commerce further states that "the change in WIP inventory is ***normally*** included as part of the COM."  *Id.* (emphasis added).  Repeated use of the word "normally" recognizes that there are instances in which a rote application of Commerce's WIP inventory adjustment practice may not be appropriate.  The facts presented in this investigation with respect to Rajhans provide one such example of a situation where a separately reported WIP inventory adjustment is not appropriate because the particular cost reporting methodology employed by the respondent obviated the need for a WIP inventory adjustment.

Commerce also points to the fact that "not all {billets} were consumed in the rod production," thus making the purported change in WIP inventory "relevant."  *Id.* at 10.  But that position fundamentally ignores the argument made by Plaintiffs that Rajhans' two-step cost reporting methodology already captures the cost of goods manufactured.  To demonstrate, Plaintiffs provide the following hypothetical example of Rajhans' methodology as shown below:

**NON-CONFIDENTIAL VERSION**

**Step 1 - Billet Production Stage**

| | Labor $/KG POI AVG | Overhead $/KG POI AVG | Material $/KG POI AVG | Total $/KG POI AVG |
|---|---|---|---|---|
| Raw Material (*e.g.*, scrap, copper, etc.) | $ - | | $ 30.00 | $ 30.00 |
| Cost Center 1 | $ 0.40 | $ 2.00 | | $ 2.40 |
| Cost Center 2 | $ 0.60 | $ 3.00 | | $ 3.60 |
| Final Per-Unit Billet Cost | $ 1.00 | $ 5.00 | $ 30.00 | *$ 36.00* |

**Step 2 – Rod Production Stage**

| | Labor $/KG POI AVG | Overhead $/KG POI AVG | Material $/KG POI AVG | Total $/KG POI AVG |
|---|---|---|---|---|
| Final Per-Unit Billet Cost | | | | *$ 36.00* |
| Machine 1 | $ 3.00 | $ 1.00 | $ - | $ 4.00 |
| Machine 2 | $ 2.00 | $ 2.00 | $ - | $ 4.00 |
| Total Brass Rod Cost | $ 5.00 | $ 3.00 | 0 | **$ 44.00** |

As shown above, there is no accumulation of WIP between production stages, which obviates any need for a WIP inventory adjustment. *See Certain Cold-Rolled Steel Flat Products from the Republic of Korea: Final Results of Antidumping Administrative Review*, 84 Fed. Reg. 10,784 (Dep't Commerce Mar. 22, 2019), and accompanying IDM at cmt. 4 ("Hyundai explained and demonstrated in its responses that its cost accounting system records transfers of WIP between cost stages and facilities at the actual cost of production."). Simply put, ***Rajhans reported its consumption costs during the period of investigation in a way that already excludes the cost of billets not consumed during that period.*** WIP inventory, in this case, are completed billets, and the change in WIP reflects the difference between the quantity of completed billets produced versus the quantity consumed or sold. Regardless of whether the WIP inventory quantity increases or decreases, the per unit cost of the WIP (*i.e.*, billets) does not change. Under Rajhans' reporting methodology, the billet cost from Step 1 above (*i.e.*, $36.00) becomes the material cost of Step 2 (*i.e.*, $36.00). As a result, Rajhans' reporting methodology

does not include costs for unused WIP (*i.e.*, unused billet) remaining in inventory.  Thus, no WIP

inventory adjustment is appropriate.

Commerce's erroneous conclusion in the *Final Determination* appears to be based on a

mistaken assumption that the costs associated with an increase of billet inventory during the

period of investigation (*i.e.*, the excess of the quantity of billets produced less the quantity of

billets consumed and the quantity of billets sold) should be treated as a reduction to the per-unit

cost of the billets consumed in brass bar and brass rod production.  However, the change in the

quantity of the billets in WIP inventory has ***no effect*** on the per-unit cost to produce billets.  The

change in WIP inventory in this case is a quantity-driven adjustment that represents how many

billets Rajhans produced versus the quantity sold or consumed in brass rod and brass bar

production (*i.e.*, the excess of the quantity of billets produced over the quantity of billets

consumed and sold equals the increase in the quantity of billet inventory from the beginning of

the period of investigation to the end).  By reducing the per unit actual cost of producing billets

by an amount associated with the net increase in the number of billets in WIP inventory during

the period of investigation, Commerce artificially lowered the actual per-unit cost incurred to

produce brass rod.  The actual materials and processing needed to produce each billet does not

change simply because the inventory of billets changed from the beginning of the year to the

end.  Regardless of whether a completed billet is sold, consumed in brass rod production, or

remains in inventory, its per-unit cost to produce remains the same.

By using a process-oriented cost methodology, Rajhans already accounts for the change

in billet inventory.  Specifically, Rajhans allocated total raw material and billet processing costs

over the total quantity of billets produced ([                    ]) in calculating its per-unit

cost of producing billets during the period of investigation.  *See* Second D SQR at Exhibit D-

9(b), Part 1 (CR 275).  Although Rajhans produced [                              ] of billet during

the period of investigation, it consumed [                              ] of billets in brass rod

and bar production when combining the [

                                        ].  *See* Rajhans' Cost

Verification Exhibits (Dec. 26, 2023) at Exhibit CVE-6, pp. 10-12 and 18 (CR 320-325).

Rajhans also [                                        ] during the period of investigation.  *See*

Second D SQR at Exhibit D-14, Part 3 (CR 277).  The production costs associated with the [

        ] of the quantity of billets produced [        ] that consumed or sold are not included in

the reported costs.  Rather, they are included in billet inventory as a part of the change in WIP

inventory.  Furthermore, Rajhans already accounted for the change in its in-process inventory in

determining the total quantity of billets consumed ([                              ]) for brass

bar and brass rod production.  As confirmed at Rajhans' cost verification, the company included

[                                        ].  *See* Rajhans'

Cost Verification Exhibits (Dec. 26, 2023) at Exhibit CVE-6, p. 18 (CR 320-325).  [

                    ] — multiplied by the per-unit cost of the billets — represent the cost of the

inputs used to produce brass rod during the period of investigation.

In short, because Rajhans' two-step cost reporting methodology already accounts for the

change in WIP inventory — *i.e.*, Rajhans used the per-unit costs of billets actually consumed in

the rod production stage — Commerce's WIP inventory adjustment was unsupported by

substantial evidence and not in accordance with law.

### 2. *WIP Inventory Adjustments Do Not Apply to Finished Goods and Saleable Merchandise*

Even assuming *arguendo* that a WIP adjustment were appropriate in this case (and it is

not), Commerce's practice is to allow a respondent to adjust its reported COM where such

adjustments result from revaluations of either raw materials or WIP and are not related to finished goods inventory. *See, e.g., Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From Mexico*, and accompanying IDM at cmt. 8 ("Commerce routinely allows a respondent to adjust its reported COM either upward or downward to reflect period inventory adjustments as long as such adjustments result from revaluations of either raw materials or WIP and are not related to finished goods inventory."). Importantly, raw materials and WIP are, by definition, not yet saleable merchandise. *See Torrington Co.*, 926 F. Supp. at 1159-60 (acknowledging that "raw materials and work in process are, by definition, not yet salable merchandise") (quoting *Results of Antidumping Duty Administrative Reviews*, 58 Fed. Reg. at 39,745). However, the items that are the subject of Rajhans' claimed WIP adjustment are, by contrast, saleable merchandise. As such, those items should not have been eligible for a WIP adjustment in any event.

At verification, Rajhans provided the following quantity-based inventory movement production report that identified the following semi-finished goods included in work-in-progress:



Rajhans' Cost Verification Exhibits (Dec. 26, 2023) at Exhibit CVE-06, p. 4 (CR 320-325). As

shown above, the semi-finished goods include [

].  Those goods are not "WIP" in the context of the

antidumping analysis because they are [

].  For example, Rajhans reported billets sold at the billet stage,

demonstrating that billet can be considered a finished good.  *See* First D SQR at 22.  Indeed, the

product scope considers Rajhans' billets be to in-scope merchandise.  *See* Commerce

Preliminary Scope Decision Memorandum (Sept. 25, 2023) at 3, 6 (PR 169) ("Rajhans Metals

requests to clarify that unwrought brass billet is excluded from the scope of the investigations….

The scope language includes unwrought brass billets that meet the physical description and do

not otherwise qualify for a stated exclusion."); *see also* Final IDM at 2 (making "no

modifications" from the preliminary scope of the investigation to the final scope of the

investigation).  Rajhans also reported billet sales in its sales database.  Rajhans' Section A

Questionnaire Response (July 26, 2023) at A-31 (PR 108).  As for the [                    ]

identified above, the schedule also indicates that the [

].  Thus, that category [

].  Finally, as for [                    ], Rajhans

similarly reported [

].  *See* Rajhans Cost Verification Report (Feb. 12, 2024) at 10 (PR 265, CR 345).

In the *Final Determination*, Commerce dismisses these concerns as "unpersuasive," yet

fails to engage with record evidence and offers only a series of conclusory statements.  *See* Final

IDM at 11.  Commerce once again relies primarily on the fact that "Rajhans' WIP inventory

includes billets" along with other "products in process" and that "billets produced during the POI

were mostly consumed in the production of rod products."  *Id.* (internal citations omitted).  But

that reasoning ignores that billets themselves constitute in-scope merchandise and that Rajhans reported billet sales in its sales database.  Nor does Commerce address Plaintiffs' arguments that other "products in process" such as [

] include [                                                                                      ].

Commerce's efforts to distinguish Plaintiffs' reliance on *Torrington Co.* by noting that case dealt with inventory carrying costs, not adjustments to COM, also fail.  *Torrington Co.* merely helps to elucidate Commerce's WIP inventory adjustment practice, as discussed in *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From Mexico*, by clarifying what may be considered "work in progress."  *See Torrington Co.*, 926 F. Supp. at 1159-60.

Commerce's determination that Rajhans should be allotted a semi-finished goods WIP adjustment hinges on a misleading characterization of the goods at issue.  Record evidence demonstrates that Rajhans' "semi-finished goods" are in fact saleable merchandise. Accordingly, the Court should find that Commerce decision in this regard was unsupported by substantial evidence and not in accordance with law.

### 3. *Rajhans' WIP Inventory Adjustment Is Distortive*

Commerce failed to address in the *Final Determination* arguments made by Plaintiffs concerning the distortive nature of the WIP inventory adjustment granted to Rajhans.  *See* Petitioners' Case Brief at 20, n.77.  That failure alone is sufficient for the Court to remand the WIP inventory adjustment issue back to Commerce for further consideration.

By granting Rajhans' WIP inventory adjustment, Commerce applied the offset on a product-specific basis in a manner that distorts Rajhans' reported costs.  Specifically, Rajhans allocated the WIP adjustment to specific products based on [

].  *See* Second D SQR at Exhibit D-10(a), Part 2.  Rajhans' billet charge amount is

calculated by starting with the finished production quantity of that product and using the product yield to determine the quantity of input billet consumed.  Therefore, applying the WIP

[                                                                    ] disproportionately allocates

[

], which is nonsensical.

As a result of the WIP allocation methodology adopted by Commerce in the *Final Determination*, certain brass rod products with identical input billet costs [

].  In other words, products with

[                                                                    ], when the opposite

should be true.  Common sense dictates that products with [          ] yield loss should have [

] because of [

], not the other way around.

Commerce's *Final Determination* does not address the distortive effects of making a WIP inventory adjustment in this manner.  In the absence of any explanation by Commerce as to why the WIP inventory adjustment here is not distortive, the Court should remand this issue back to Commerce for further consideration and explanation.

**4.  *In Granting the WIP Inventory Adjustment, Commerce Should Have Made Further Adjustments to Rajhans' Scrap Offset***

As discussed in Section V.C *infra*, "Commerce's practice is to value inputs that are recycled by being reintroduced into the production process as substitutes of the original input with values based on the original source input.  Because runaround scrap is reintroduced into the production process, Commerce's practice is to value that scrap based on the original inputs for which runaround scrap is substituted in the production process."  *Common Alloy Aluminum Sheet from the People's Republic of China: Final Results of Antidumping Duty Administrative Review;*

*2020-2021*, 87 Fed. Reg. 54,975 (Dep't Commerce Sept. 8, 2022), and accompanying IDM at

cmt. 5 (citing *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules,*

*from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, and*

*Affirmative Final Determination of Critical Circumstances, in Part*, 77 Fed. Reg. 63,791 (Dep't

Commerce Oct. 17, 2012), and accompanying IDM at cmt. 9).  Put another way, ***the per-unit***

***scrap offset value is supposed to match the value of the scrap when reintroduced into the billet***

***production process.***  Consistent with this principle, Commerce should only approve a scrap

offset methodology where "the quantities and values of the generated and reintroduced

byproducts completely offset each other and therefore, have no net effect on the reported costs."

*Certain Oil Country Tubular Good from the Republic of Korea: Final Results of Antidumping*

*Duty Administrative Review; 2017-2018*, 85 Fed. Reg. 41949 (Dep't Commerce July 13, 2020),

and accompanying IDM at cmt. 8.

 By granting Rajhans its WIP inventory adjustment, Commerce effectively allowed a

[  ] percent reduction of the net amount of the runaround scrap in the buildup of the pristine

billet production cost.  Put another way, the average cost of runaround scrap in the billet cost

buildup — net of the WIP inventory adjustment — was not [      ] as

Commerce calculated, but instead [        ].

Plaintiffs argued that, to ensure that the scrap offset for the runaround scrap still equals the net

value of that scrap when reintroduced into the production of billet, the scrap offset needed to be

further reduced.

 Commerce did not make this adjustment.  Instead, Commerce stated, without any

elaboration or explanation, that WIP inventory "is unrelated to the scrap offset calculation" and

concluded that "no further adjustment is warranted for the final determination."  Final IDM at

**NON-CONFIDENTIAL VERSION**

11.  The Court should find that Commerce failed to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," *Tianjin Magnesium,* 722 F. Supp. 2d at 1328, and remand this issue back to Commerce for further consideration and explanation.

Accordingly, for the reasons detailed above, the Court should hold Commerce's determination to grant a WIP inventory adjustment to Rajhans to be unsupported by substantial evidence and not in accordance with law.

### C.  Commerce's Adjustment to Rajhans' Scrap Recovery Methodology Is Unsupported By Substantial Evidence and Not in Accordance With Law

This issue concerns how Rajhans valued the scrap byproduct generated during production, which was later re-introduced into the start of billet production process (often called "runaround scrap").  *See* Final IDM at 6 ("In the normal course of business, Rajhans generates scrap at the rod production stage and the generated scrap is mostly reintroduced into production at the billet stage.").  Recall that Rajhans produces its brass rod and calculated its costs in two stages.  First, in the billet production stage, Rajhans melts various raw material inputs together to produce a brass billet of a specified chemistry, and Rajhans calculated the costs to produce billets based on standard recipes.  *See* Second D SQR at 4 ("Rajhans calculated billet costs based on the standard recipes Rajhans maintains in the ordinary course of business.") and Exhibit D-9(b).  Second, in the "rod production stage," Rajhans uses these brass billets as inputs to produce finished brass rod products of various specifications, and Rajhans calculated the costs for such brass rod products based on the input billet cost (calculated in the first step) and the standard yield rate for each brass rod product.  *See* Second D SQR at Exhibit D-10(a).

For the rod production stage, Rajhans reported yield rates ranging from [     ] to [     ] percent depending upon the particular brass rod product, with the resulting scrap being

**NON-CONFIDENTIAL VERSION**

reintroduced as raw material inputs in the billet production stage. *See id.*; Final IDM at 6. Rajhans does not value this runaround scrap in its normal books and records. Final IDM at 6. Accordingly, when applying a scrap byproduct offset in its buildup of costs for the rod production stage, Rajhans used the cost it calculated to produce the pristine billets — which are the ***inputs*** for the rod production stage — as the value of the scrap generated ***from*** the rod production stage. *See* First D SQR at 9 ("The scrap offset for bars and rods was considered at the rate at which billets were consumed in the production of bars and rods."); Second D SQR at Exhibit D-10(a) (Excel column K, "Billet cost per KG").

To determine the cost to produce the billets of various chemistries that Rajhans produced, Rajhans used standard "recipes" that it maintains for specific billet "chemical codes." Second D SQR at 4-5. These "recipes" identify the standard quantity of various raw material inputs necessary to produce a standard quantity of billet of a specified chemical code. *Id.* at 4 ("The recipes consist of a combination of brass, copper, lead, Swarf and other elements as per the requirement of each respective internal chemical code.") Thus, to determine the cost of materials to produce a billet of a particular chemical code, Rajhans took the quantity of each of the input materials in its recipe and multiplied the quantities by the cost of each of the materials and summed the result. *Id.* at 4-5. Notably, these recipes call for various categories of "swarf" as inputs. This "swarf" is scrap — both internally-generated "runaround scrap" and scrap that Rajhans purchased from external sources. *Id.* at 4 n.3 ("Swarf is brass scrap of different grades either generated in {Rajhans'} production process or purchased from third parties."). Rajhans valued the scrap used in the billet recipes based on the cost of Rajhans' purchased scrap used in that recipe. *Id.* at 10 ("Rajhans manually scrutinized all the invoices of swarf and identified the grade of the actual swarf (scrap) purchase."). And for any recipes where Rajhans used only

runaround scrap, it valued such scrap using the overall average cost of scrap purchases from external sources.  *Id.* ("For grades that were consumed but not purchased (*i.e.* scrap from job work production), Rajhans has considered the average rate at which swarf is purchased to calculate the value of that swarf.").

Because the scrap generated from the rod production stage is the ***same scrap*** that is reintroduced as an input in the billet production stage, a major flaw in Rajhans' methodology is that Rajhans valued scrap generated from rod production at the ***higher value*** of a pristine billet, and scrap reintroduced into billet production at the ***lower value*** of purchased scrap.  *See* Final IDM at 7 ("Although Rajhans might be able to identify the chemical code of the generated scrap at the rod making stage, the generated scrap does not have the same market value as a pristine billet.").  In other words, Rajhans valued the ***same scrap*** at a lower value when it was adding to costs and a higher value when it was offsetting costs.  *See id.* ("Rajhans' scrap valuation methodology used for the reintroduced scrap at the billet production stage is inconsistent with that of the generated scrap at the rod production stage (*i.e.*, scrap offset)).  It was this obvious distortion — *i.e.*, a lack of parallelism between scrap value as an input and scrap value as a byproduct offset — that Commerce sought to correct in the *Final Determination* when it revised the value of Rajhans' scrap offset using the ratio of the value of reintroduced scrap at the billet production stage to the value of the scrap offset at the rod production stage.  *See id.* at Cmt 1.  But there remains a second major flaw that Commerce's adjustment method did not remedy and that Commerce's *Final Determination* did not even address.

When Rajhans valued the scrap generated at the rod production stage based on the input billet, it did so using the chemical code-specific value of that billet.  *See* Second D SQR at Exhibit D-10(a).  Therefore, rod products made from different billets had different per-unit

values assigned to the quantities of scrap they generated.  *Id.*  But having these chemical code-specific variations in the per-unit scrap value at the rod stage is distortive and flawed because, as Plaintiffs argued in our case brief, runaround scrap was not necessarily [

], which is the only way a chemical code-specific valuation of runaround scrap would be reasonable.  Petitioners' Case Brief at 13 (citing Cost Verification Report at 5; Cost Verification Exhibits at CVE-03 p. 27).  Instead, runaround scrap was being [                                                                                        ].  *Id.*

Put another way, because Commerce failed to address these scrap value variations, there still remained a mismatch between how the scrap was being valued as an input versus how scrap was being valued as a byproduct offset.  The *Final Determination* is therefore unsupported by substantial evidence and not in accordance with law because Commerce not only failed to correct this distortion, but it also failed to address or even acknowledge the issue despite Plaintiffs raising it in their administrative case brief.

**1. *Commerce Failed to Address the Scrap Value Variation Issue in the Final Determination***

Plaintiffs raised the issue of Rajhans' product-specific scrap valuation in their administrative case brief.  Specifically, Plaintiffs explained that Rajhans' methodology "only seems reasonable if there were a 'closed loop,' — *i.e.*, if the particular scrap grade generated from producing a specific finished product were re-introduced as an input into the identical billet with the same chemical code used for that product."  Petitioners' Case Brief at 13.  Plaintiffs then explained that the record demonstrates that no such closed loop exists because "[

]."  *Id.*  Plaintiffs further argued before Commerce that the chemical code-specific valuation is inconsistent with Rajhans' own valuation of its runaround scrap.  In addition to the [

] Rajhans used to value its self-generated scrap in its cost reconciliation, Plaintiffs cited to the [                                                                                    ] that Rajhans reported in its billet recipes.  *Id.* at 16 n.62.

Given these issues, Plaintiffs even suggested programming language that Commerce could use to address the issue by averaging the values assigned to the scrap generated from rod production, which would have been more consistent with Rajhans' billet cost methodology and the record evidence regarding the [                                                                         ].  *See* Petitioners' Case Brief at 15.  But the *Final Determination* addresses **only** the first scrap issue regarding the overvaluation of the rod scrap offset and is completely silent as to the second issue regarding the scrap value variation.

For this reason alone, a remand is appropriate so that Commerce can consider this issue in the first instance.  As the Federal Circuit has explained, "an agency explanation may be unreasonable if the agency 'entirely failed to consider an important aspect of the problem.'" *SKF USA Inc. v. United States*, 630 F.3d 1365, 1374 (Fed. Cir. 2011) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 42 (1983).  The Federal Circuit further explained that "Commerce . . . has an 'obligation' to address important factors raised by comments from petitioners and respondents." *Id.* (citing *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1358 (Fed. Cir. 2005).  Moreover, this Court has ordered remand in cases where Commerce failed to consider contrary evidence.  For example, in *Guizhou Tyre Co., Ltd.*, this Court remanded an issue to Commerce for failing to refer to a report in its issues and decision memorandum that a respondent party argued provided evidence contrary to Commerce's conclusion.  *See Guizhou Tyre Co., Ltd. v. United States*, 389 F. Supp. 3d 1350, 1358-59 (Ct. Int'l Trade 2019) (citing *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367,

1373 (Fed. Cir. 2016)).  Accordingly, because Commerce failed to address — or even refer to — Plaintiffs' argument concerning this issue in the Final IDM, the *Final Determination* is unsupported by substantial evidence and not in accordance with law.

      **2.**   ***Commerce Failed to Correct the Distortion Caused By Rajhans' Flawed Methodology***

As Plaintiffs argued in their case brief, Commerce could have addressed the distortion caused by Rajhans' inconsistent and inaccurate scrap offset valuation by applying a single average per-unit value to Rajhans' self-generated scrap, which would still account for differences in yield between rod products but would disregard differences in billet chemistry.  *See* Petitioners' Case Brief at 15.  Applying a single average per-unit scrap value is the most reasonable approach because the impact of any differences in chemistry on scrap value are not preserved when scrap is [

                                ], as the record indicates.  *See* Petitioners' Case Brief at 13 (citing Cost Verification Report at 5; Cost Verification Exhibits at CVE-03 p. 27).  Moreover, Rajhans itself used [

         ].  *See* Second D SQR at Exhibit D-9(b) (Excel columns BC to BV).

An example may help illustrate the issue.  Rajhans produced the rod product [

                                 ] from billet of chemical code [     ].  *See* Second D SQR at Exhibit D-10(a) Part-2 (row 107).  Rajhans valued the scrap offset, *i.e.,* the scrap generated *from* this product, at the "Billet cost per KG" rate it calculated for [     ], which was [     ] rupees/kg.  *Id.*  The billet recipe for [     ] includes scrap type [     ] as the *input* scrap for [     ], which Rajhans valued at [     ] rupees/kg, *i.e.*, the overall average cost of all Rajhans' purchased scrap.  *See id.* at Exhibit D-9(b) Part 2 (row 107, columns R and BO).  This imbalance — valuing the same scrap at [     ] rupees/kg when valued as a

byproduct offset and [          ] rupees/kg when valued as an input — illustrates the scrap value

imbalance problem that Commerce addressed in the Final IDM.  But the second problem with

this methodology — which Commerce failed to address — only becomes clear when compared

with another example.

Rajhans produced the rod product [                              ] from billet of

chemical code [      ].  *See* Second D SQR at Exhibit D-10(a) Part-2 (row 751).  Rajhans valued

the scrap offset for this product using the "Billet cost per KG" rate it calculated for [        ],

which was [          ] rupees/kg.  *Id.*  The billet recipe for [        ] includes scrap type [        ] as

an input scrap for [        ].  *Id.* at Exhibit D-9(b) Part 2 (row 126, column Y).  The value assigned

to scrap type [         ] was [          ] rupees/kg, similar to the example above.  *Id.* at Exhibit D-

9(b) Part 2 (row 126, column BU).

Therefore, when calculating the cost of the [                      ] input scrap used to

produce these two different billets, Rajhans used [                            ] rupees/kg, which

was based on the average cost of its purchased scrap, but then Rajhans claimed two *different*

chemical code-specific scrap values for the scrap offset applied in its rod production cost buildup

for these products, *i.e.*, [         ] rupees/kg and [         ] rupees/kg.  This example highlights

why the adjustment Commerce applied — which simply reduced the scrap offset for all products

at the rod production stage by [        ] percent — did not correct the distortion caused by this

issue.  *See* Commerce Memorandum, "Cost of Production and Constructed Value Calculation

Adjustments for the Final Determination – Rajhans Metals Private Limited" (Apr. 15, 2024) (PR

296, CR 357) at 1-2.  Based on Rajhans' own reporting, the value of the scrap generated from

chemical codes [        ] and [      ] should both be the [                    ] rupees/kg.  Instead,

Commerce allowed Rajhans to distort its cost reporting by assigning [                  ] values to the

**NON-CONFIDENTIAL VERSION**

scrap generated from these billets, even though Rajhans valued the scrap [            ] when used

as an input.

Put simply, if Rajhans values different types of scrap [            ] when being

reintroduced to the production process, they should also be valued [

].  But Commerce's adjustment preserved the [

].

Accordingly, this Court should remand this issue to Commerce with instructions to

address and correct the distortion cause by Rajhans' unsupported and unreasonable methodology.

### D.  Should the Court Invalidate Rajhans' Final Dumping Margin, the Court Must Also Invalidate the Resulting Calculation of the All Others Rate

In the event the Court finds that the dumping margin calculated for Rajhans in the *Final

Determination* to be unsupported by substantial evidence or unlawful for any reason, the Court

must also find the All Others rate applicable to non-individually investigated companies —

which derives in part from Rajhans' dumping margin — to be unlawful as well.

The statute provides that the estimated weighted-average dumping margin for all other

producers and exporters not individually investigated shall be equal to the weighted average of

the estimated weighted-average dumping margins established for individually investigated

exporters and producers, excluding rates that are zero, *de minimis*, or entirely on the basis of

facts otherwise available.  *See* 19 U.S.C. § 1673d(c)(5)(A).  In the underlying investigation,

Commerce calculated individual estimated weighted-average dumping margins for Rajhans of

2.19 percent and for Shree of 5.42 percent.  *See Final Determination*, 89 Fed. Reg. at 29,301 (PR

303).  Because the individually calculated margins for Rajhans and Shree were not zero, *de

**NON-CONFIDENTIAL VERSION**

*minimis,* or based entirely on facts otherwise available, Commerce calculated an All Others rate of 2.41 percent.  *See id.*; *see also* Commerce Final All Other Rate Calculation Memorandum (Apr. 16, 2024) at 1-2 (CR 356).

Should the Court find Rajhans' final dumping margin to be unsupported by substantial evidence or otherwise not in accordance with law for any of the reasons outlined above, the Court must likewise find the All Others rate from the *Final Determination* to be invalid because it is based, in part, on an impermissible dumping margin calculated for Rajhans in the *Final Determination*.  Thus, the Court should remand the All Others rate calculated by Commerce in the *Final Determination* should any of Plaintiffs' other claims succeed in this action.

## VI.    CONCLUSION

For these reasons, we respectfully request that this Court remand the *Final Determination* to Commerce.

*       *       *       *       *

Respectfully submitted,


/ s / Paul K. Keith

Paul K. Keith, Esq.
Daniel J. Calhoun, Esq.
Jack A. Levy, Esq.
Noah A. Meyer, Esq.
Neal M. Halper*, Director of Accounting*
Susan Moyer, *Director Data Analysis*
Carl P. Moyer, *Director Economic Analysis*
Hiroko K. Hagen, *Director Statistical Analysis*
Stan T. Bowen, CPA

**ROCK CREEK TRADE LLP**
*Counsel for Plaintiffs*

### Certificate of Compliance with Chambers Procedures 2(B)(1)

The undersigned hereby certifies that the foregoing brief contains 9,930 words, exclusive of the caption block, table of contents, table of authorities, signature block, and certificates of counsel, and therefore complies with the maximum 14,000 word count limitation set forth in the Standard Chambers Procedures of the U.S. Court of International Trade.

By:     /s/ Paul K. Keith

        Paul K. Keith

## CERTIFICATION OF SERVICE

PUBLIC SERVICE

*American Brass Rod Fair Trade Coalition, et al. v. United States*
Court No. 24–00119

This is to certify that on January 10, 2025, I have caused a copy of the foregoing **MOTION FOR JUDGMENT ON THE AGENCY RECORD** and accompanying public version of **BRIEF IN SUPPORT** to be electronically served upon the following parties via the Court's CM/ECF electronic filing system:

Sosun Bae, Esq.
*Representative of Defendant United States*
**U.S. Department of Justice**
Commercial Litigation Branch
Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC  20044
Email: sosun.bae@usdoj.gov

Lizbeth R. Levinson, Esq.
*Representative of Defendant-Intervenor*
*Rajhans Metal Private Limited*
**Fox Rothschild LLP**
2020 K Street NW, Suite 500
Washington, DC 20006
Email: llevinson@foxrothschild.com

/s/ Paul K. Keith

Paul K. Keith, Esq.
**ROCK CREEK TRADE LLP**
900 19th Street, NW, Suite 600
Washington, DC 20006
(707) 761-0404